[No. H024442. Sixth Dist. Jan. 27, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVE BAUTISTA et al., Defendants and Appellants.

[No. H026395. Sixth Dist. Jan. 27, 2004.]

In re DAVE BAUTISTA, on Habeas Corpus.

COUNSEL

Meredith Fahn, under appointment by the Court of Appeal, for Defendant, Appellant and for Petitioner Dave Bautista.

Rex Williams, under appointment by the Court of Appeal, for Defendant and Appellant Michael Bautista.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Eric D. Share and Catherine A. McBrien, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PREMO, J.**—Brothers and codefendants Dave and Michael Bautista (Dave and Michael)[1] appeal their conviction of possession of marijuana for sale based upon their guilty pleas after their motion to quash a search warrant and suppress evidence was denied by the trial court. On appeal, both contend that the court erred in finding that a Drug Enforcement Administration (DEA) officer did not impermissibly use military personnel to obtain the evidence supporting the search warrant in violation of the Posse Comitatus Act (PCA). (18 U.S.C. § 1385.) In a petition for a writ of habeas corpus, which we have ordered considered together with the appeal, Dave asserts that his trial counsel rendered ineffective assistance of counsel because he did not advise Dave that he would be subject to mandatory deportation and exclusion from the United States for conviction of the charge to which he pled.

### FACTS

On July 6, 2000, DEA Agent Joseph Muenchow and other agents made a third trip to a public storage facility at 1395 Mabury Road in San Jose on an investigation unrelated to this case that began in November 1999. Because the two sheriff's narcotics detection dog and handler teams that Muenchow normally used were unavailable that day, Muenchow had contacted agent Stan Baroff at the DEA office at San Francisco airport who arranged for the assistance of United States Army Sergeant James Harris, and Harris's narcotics detection dog, Rocko. Army narcotics detection canine teams were given previous assignments for the DEA, and "dog handlers and their dogs rotate in and out to assist DEA task force . . . ." Muenchow did not check for the

---

[1] Convenience, not disrespect, is intended by use of defendants' first names. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 280 [111 Cal.Rptr.2d 755].)

availability of a dog team with the California Highway Patrol (CHP) whose narcotics detection dog teams he had also used in the past or with other local narcotics task forces.

Muenchow was aware of the PCA and knew that use of the military by civilian law enforcement was not allowed. The PCA provides "[w]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." (18 U.S.C. § 1385.)[2] In 1981, Congress amended the PCA to allow for certain military assistance in fighting the war on drugs (10 U.S.C. §§ 371–378), but the statutory exceptions were intended to be narrowly limited, so as "not [to] include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law." (10 U.S.C. § 375.)[3] Muenchow relied on his supervisor when he accepted the assistance of Harris and Rocko.

Harris and Rocko met the agents at the storage facility. On their way to the area Muenchow was interested in, they "just happened to stroll" past defendants' locker, B-46. Rocko had been let off his leash, and he went directly to the vicinity of B-46 and sat down. This was the signal Rocko and Harris used for a positive "alert" for narcotics. It was not clear whether Rocko was alerting to B-46 or B-47, so Harris walked him away and then twice let him return to the area. At that point, it became clear to Harris that Rocko was alerting to locker B-46.

---

[2] "Posse comitatus" comes from "posse" meaning "to be able," "to have power," and "comitatus" meaning a "county." Usually the phrase refers to the entire body of those inhabitants who may be summoned by the sheriff of a county to assist in preserving the public peace as, for example, during a riot, or when the sheriff must execute any legal precept that is forcibly opposed. At common law, the sheriff could summon every male over 15 years of age and not infirm. (Webster's New Internat. Dict. (2d ed. 1958) p. 1926.)

As stated in the legislative history of the original enactment, " 'whenever you conclude that it is right to use the Army to execute civil process . . . it is no longer a government founded upon the consent of the people; it has become a government of force.' " (Flock, *The Legality of United States Military Operations Along the United States-Mexico Border* (Fall 1998) 5 Sw. J.L. & Trade Am. 453, 469; *Laird v. Tatum* (1972) 408 U.S. 1, 16–40 [33 L.Ed.2d 154, 92 S.Ct. 2318] (dis. opn. of Douglas, J.) quoting remarks of Sen. Hill, 7 Cong. Rec. 4247 (1878).)

[3] After the September 11, 2001, attack on the World Trade Center and the Pentagon, the debate and passage of the Homeland Security Act aroused concern about the preservation of fundamental rights in day-to-day life within the national borders. (Judicial notice was taken of Cong. Rec., July 29, 2002, extensions of remarks of Hon. Cynthia A. McKinney and Hon. Diana DeGette on July 26, 2002, and Cong. Rec.—House on July 23, 2002, remarks of Mr. Paul from Texas.) Congress expressly affirmed the PCA and its underlying policies in title 6 United States Code section 466.

Harris and Rocko were certified by the Military Working Dog team on December 17, 1999. In the affidavit in support of the search warrant, Muenchow stated that Rocko was certified as a patrol dog in narcotics detection at a 93 percent accuracy rate. Under military rules, a dog loses certification if the detection rate falls below 90 percent for three or more consecutive months, if the dog is separated from the handler, or fails to train for 30 or more consecutive days, or if a new trainer/handler is assigned. Rocko and Harris were currently certified and currently were in compliance with all military requirements. Rocko was certified to detect cocaine, heroin, methamphetamine, and marijuana in all its forms. Because of the extent of Rocko's training, it was not possible to determine what type of controlled substance caused him to "alert." Muenchow stated Rocko may have alerted on any individual controlled substance or any combination for which he is trained.

Using a federal administrative subpoena which may be authorized by the acting supervising agent at the DEA office, Muenchow obtained the rental agreement which identified Michael as the renter and Dave as someone who had access to the locker. Muenchow ran a record check on defendants and learned that Dave had two arrests in Fresno and Coalinga in 1994 for using a false compartment in violation of Health and Safety Code section 11366.8. No disposition was listed for the Fresno case and the Coalinga case was dismissed. However, marijuana and "$4,000 was seized" in that case.

Muenchow obtained the search warrant the same day, and then returned to the storage facility and searched locker B-46. He seized approximately 100 pounds of marijuana.

The next day, Muenchow went to defendants' home, searched their house, found a small bag of marijuana in Michael's bedroom, and arrested them. Dave admitted that he and Michael shared the storage locker.

Defendants were charged and pled guilty to a violation of Health and Safety Code section 11359, possession for sale of marijuana. Their earlier motions to quash the search warrant and suppress the evidence had been denied and the plea bargain promised them prison terms of 16 months. They received the agreed-upon sentences. These appeals ensued.

## ISSUE ON APPEAL

Defendants assert their motions to quash and suppress should have been granted because the evidence supporting issuance of the search warrant was obtained through the impermissible use of military personnel in civilian law enforcement in violation of the PCA. Dave argues this violated his Fourth Amendment rights.

## STANDARD OF REVIEW

" ' "In ruling on [a motion to suppress evidence], the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquires is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review." ' " (*People v. Ayala* (2000) 24 Cal.4th 243, 279 [99 Cal.Rptr.2d 532, 6 P.3d 193].)

## DISCUSSION

Defendants complain that Harris's and Rocko's "alert" constituted direct involvement of the military in a civilian law enforcement procedure. In denying the motion to quash and suppress at preliminary hearing, the magistrate said, "this dog, I believe, gave them a tip. I think that was indirect military involvement . . . . I don't think this indirect assistance to civilian authorities without subjecting civilians to the exercise of military power that is regulatory, proscriptive or compulsory in nature, was what occurred. . . . I believe this was indirect assistance to a civilian authority."

When the motion was brought de novo in superior court, the judge denied the motion stating, "I don't see where Sergeant Harris' involvement resulted in some kind of regulatory compulsive military power or exercise. It certainly didn't amount to a direct or active involvement in execution of laws. He was there to report. He wasn't there to enforce, and it does not seem that he pervaded the activity of the civilian authorities, i.e., the Department of Justice fellow who was part of the investigation. He was there as sort of an assistant or an ancillary tool to help rather than to direct."

■ Defendants had a protectable privacy interest in the storage locker that they rented. However, they did not have a protectable privacy interest in the air space around the locker or the air that emanated from the locker. (*People v. Mayberry* (1982) 31 Cal.3d 335, 341 [182 Cal.Rptr. 617, 644 P.2d 810].) Agent Muenchow and Sergeant Harris were rightfully in the public space of a public storage facility on an investigation unrelated to defendants. It is unknown if this investigation was related to airport security, the purpose for which Sergeant Harris and Rocko were assigned to San Francisco airport.

While Muenchow and Harris were where they had a right to be, they observed Rocko unexpectedly "alert" on a storage locker. "[E]xposure of respondent's luggage, which was located in a public place, to a trained canine-did not constitute a 'search' within the meaning of the Fourth Amendment." (*United States v. Place* (1983) 462 U.S. 696, 707 [77 L.Ed.2d 110, 103 S.Ct. 2637].) Our Supreme Court has also found a dog sniff not to be a search requiring any level of objective justification under the Fourth Amendment. (*People v. Mayberry, supra*, 31 Cal.3d at p. 342.)

The significance and reliability of Rocko's "alert" was conveyed to Muenchow by Rocko's handler, Harris. Rocko's alert as interpreted by Harris was a "tip" from an informant who made an observation that caused him to believe a crime was being committed which he reported to a law enforcement officer. No one, officer or citizen or member of the military, happening on a fact indicating that a crime is being committed during an investigation of another case, has to ignore it. (See *People v. Ortiz* (1956) 147 Cal.App.2d 248, 252 [305 P.2d 145].) Harris properly communicated the significance of Rocko's "alert" to Muenchow. Harris did not participate any further in the investigation of the tip. He did not write the search warrant affidavit, testify before the magistrate, conduct the search of the locker, or seize the marijuana. Giving a tip did not constitute an exercise of regulatory, proscriptive, or compulsory military power or direct involvement in the execution of laws, nor did it pervade[4] the activities of civilian authorities. (*United States v. Kahn* (9th Cir. 1994) 35 F.3d 426, 431.)

■   Muenchow obtained the search warrant and conducted the search. The magistrate correctly found reasonable cause for issuance of the warrant. A dog alert can provide the probable cause needed for a search warrant. (*United States v. Spetz* (9th Cir. 1983) 721 F.2d 1457, 1464; *Estes v. Rowland* (1993) 14 Cal.App.4th 508, 532 [17 Cal.Rptr.2d 901].) Harris and Rocko were reliable informants. Muenchow knew their identity, their training and experience, and the fact that Harris and Rocko were acting voluntarily and openly with no apparent reason to speak falsely. (See *People v. Superior Court (Meyer)* (1981) 118 Cal.App.3d 579, 582 [173 Cal.Rptr. 544].) Muenchow corroborated the tip by his personal observation of Rocko's behavior

---

[4] "Pervade" means to pass or go through, to penetrate, to traverse or to pass, flow or spread through as through the pores or tissues of, to permeate; hence, to be diffused throughout. (Webster's New Internat. Dict., *supra*, p. 1830.) Dave states that the fact that "Harris and other trained Army dog handlers 'rotate in' to be 'on assignment' to serve as the 'DDY [temporary duty assignment with the DEA]' and assist the DEA in its investigations" indicates that use of the military pervaded the DEA's local law enforcement. "[R]egular and systematic assistance by military investigative agents to civilian law enforcement in the investigation of local drug traffic" is specifically proscribed in *People v. Blend* (1981) 121 Cal.App.3d 215, 228 [175 Cal.Rptr. 263]. However, as mentioned *ante*, the record does not contain any details of the frequency or type of other investigations in which the DEA used Army dog teams, so there are no facts from which we can find that the use of the military is pervasive.

and his past experience with canine narcotics detection teams. (See *People v. Schunk* (1991) 235 Cal.App.3d 1334 [1 Cal.Rptr.2d 438].) Muenchow knew from his training and experience that drugs are commonly kept in storage lockers. Muenchow also knew from his investigation of defendants before he sought the search warrant of Dave's prior possession of marijuana and $4,000 and his arrests for the use of a false compartment. Defendants' motions were correctly denied. There was probable cause for issuance of the warrant and there was no violation of the PCA.

## WRIT PETITION

In his petition for a writ of habeas corpus, Dave contends that his trial counsel's representation fell below the standards for effective assistance of counsel because his trial counsel failed to advise him that deportation and exclusion from readmission[5] was mandatory (8 U.S.C. § 1227(a)(2)(A)(iii)) for possession of marijuana for sale, an "aggravated felony" under federal law (8 U.S.C. § 1101(a)(43)(B)), and did not attempt to negotiate a plea bargain to a nonaggravated felony such as offering to sell marijuana (Health & Saf. Code, § 11360).

The People respond that the petition should be dismissed for failure to first seek relief in the trial court and that even if the petition is properly before this court, Dave has not met his burden of proving ineffective assistance of counsel.

■ An appellate court will usually deny a writ of habeas corpus where the petitioner has failed to make a motion or otherwise raise the point in the trial court. (*People v. Lempia* (1956) 144 Cal.App.2d 393, 398 [301 P.2d 40].) However, a habeas corpus petition may be entertained in the first instance by an appellate court if a fundamental constitutional right is involved. (*In re Moss* (1985) 175 Cal.App.3d 913, 922 [221 Cal.Rptr. 645].) Here, the fundamental constitutional right of effective assistance of counsel is in issue. "We, therefore, entertain the present matter in the first instance. [Citations.]" (*Ibid.*)

In response to Dave's allegations in his petition, in a declaration under penalty of perjury, his attorney declared that the defense effort was focused

---

[5] "Deportation" means removal from the United States and does not necessarily preclude readmission. In contrast, "exclusion" means permanent removal and banishment, i.e., denial of reentry into the United States at any time or for any purpose. (See *Barber v. Gonzales* (1954) 347 U.S. 637, 640–642 [98 L.Ed. 1009, 74 S.Ct. 822].) "Aliens subject to deportation, however, are not automatically or indefinitely subject also to exclusion. An alien in the United States becomes subject to exclusion only if actually deported; some deportable persons who agree to depart the United States at their own expense may have available a voluntary departure remedy not entailing exclusion from reentry." (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 208 [96 Cal.Rptr.2d 463, 999 P.2d 686].)

primarily on the motion to quash the search warrant and suppress the evidence, and when that failed, his strategy shifted to negotiation of a plea bargain with the most lenient sentence possible. The attorney knew that Dave had a green card and was not a citizen, and he knew that violation of Health and Safety Code section 11359 was a deportable offense. He advised Dave that he "would be deported" as a result of conviction unless for some reason an INS (Immigration and Naturalization Service) hold was not placed upon him. The attorney did not attempt to "plead upward," that is, pursue a negotiated plea for violation of a greater but nonaggravated offense such as sale, transport, or offer to sell or transport (Health & Saf. Code, § 11360) because "[t]he possibility . . . never entered my mind in this case. [6] Accordingly [he] never advised [Dave] that an upward plea such as sales would carry a stiffer prison sentence yet would not result in deportation." The attorney obtained a 16-month term for Dave, which is the lowest term allowable for conviction under Health and Safety Code section 11359. (See § 18.) Dave served his term in prison, and upon his release, the INS transported him to El Centro where he was held for deportation after determination of his appeal. He has since been released pending the outcome of his appeal.

■ The petitioner in a habeas corpus proceeding bears the initial burden of demonstrating that he or she has been deprived of effective assistance of counsel. (*People v. Haskett* (1990) 52 Cal.3d 210, 248 [276 Cal.Rptr. 80, 801 P.2d 323].) He or she must establish that no reasonably competent attorney would have done what defense counsel did and that he or she was prejudiced by defense counsel's conduct (*People v. Frye* (1998) 18 Cal.4th 894, 979 [77 Cal.Rptr.2d 25, 959 P.2d 183]), i.e., that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. (*People v. Lucas* (1995) 12 Cal.4th 415, 436 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

Michael K. Mehr, an attorney who has practiced extensively in representation of immigrants in criminal courts in the State of California to avoid or

---

[6] *United States v. Rivera-Sanchez* (9th cir. 2001) 247 F.3d 905 held that a conviction of Health and Safety Code section 11360, subdivision (a), is not an aggravated felony under immigration law if the record of conviction (the complaint or amended complaint, plea, sentence and any admissions made at the time of plea but not the police report) shows that the defendant was convicted of "offering" to transport, sell, furnish, or give away a controlled substance. The basis for the decision is that "offering" to sell, etc., is equivalent to "solicitation" to commit that offense, and Congress did not make "solicitation" to commit an "aggravated felony" an "aggravated felony." *Coronado-Durazo v. I.N.S.* (9th Cir. 1997) 123 F.3d 1322, 1324, held that solicitation to commit an offense relating to controlled substances in violation of a generic solicitation statute is not even a deportable offense of a crime related to a controlled substance offense.

minimize adverse immigration consequences of criminal convictions and to obtain postconviction relief to eliminate immigration consequences, submitted a declaration as an expert witness.[7] Mehr stated he answered four questions for Dave's appellate counsel: (1) What are the *actual* immigration consequences of the conviction and sentence in this case for Dave; (2) Did the representation and advice given by the attorney fall below the standards for reasonably effective assistance of counsel under California law with regard to his advice and representation during plea bargaining; (3) Whether the defendant had a reasonable probability of obtaining a plea bargain with less adverse immigration consequences; and (4) If the defendant had been convicted of a removable offense which was not an "aggravated felony," what would be his chances of obtaining discretionary immigration relief?

Mehr noted that Dave was a long-time permanent resident of the United States. With the exception of the instant crime, Dave had never been convicted of any crime. He was 28 years old and had lived in the United States for more than 17 years. His entire family lived in San Jose, California, including his father and his American citizen mother, his five siblings who are all American citizens, his wife, and his two American citizen children, a one-and-a-half-year-old son and a seven-year-old daughter.

Mehr stated the conviction for possession for sale of marijuana made Dave subject to mandatory removal from the United States, permanent ineligibility to reenter the country (8 U.S.C. § 1182(a)(9)(A)(i)), and also made him inadmissible to reenter (8 U.S.C. § 1182(a)(2)(A)(i)(II)) because he was convicted for an offense relating to controlled substances and drug trafficking (8 U.S.C. § 1182(a)(2)(C)). Because the conviction is an "aggravated felony" for immigration purposes, Dave is permanently precluded from naturalization (8 U.S.C. § 1101(f)(8)). If Dave returned illegally after deportation, he would be subject to imprisonment for up to 20 years for the federal offense of illegal reentry after deportation for an "aggravated felony" (8 U.S.C. § 1325(b)(2)).

In Mehr's opinion, the representation fell below objective standards of reasonableness. "Defendant received only a pro forma caution from his

---

[7] Mehr also practices before the Executive Office of Immigration Review, the trial level immigration court, the Board of Immigration Appeals with regard to removal proceedings resulting from criminal convictions. He consults with criminal and immigration attorneys on the immigration consequences of criminal convictions and criminal law defense techniques, both pretrial and postconviction, to avoid or minimize immigration consequences, and he has submitted declarations or provided testimony as an expert witness on these matters. He wrote and updated a chapter in "the leading treatise on immigration consequences" of criminal convictions in California, entitled California Criminal Law and Immigration (2002 update) published by the Immigrant Legal Resource Center. Since 1980 he has been a frequent speaker at immigration and criminal lawyers' continuing legal education programs giving MCLE credits.

attorney about the deportation consequences of his guilty pleas." (*People v. Soriano* (1987) 194 Cal.App.3d 1470, 1481–1482 [240 Cal.Rptr. 328].) A defendant should be able to make "informed decisions" after "meaningful consultation with his attorney" about pleas which will have different immigration consequences and whatever advice is given must be "founded on adequate investigation of federal immigration law." (*Ibid.*) If the attorney had researched the matter or "made a 5 minute phone call to an immigration attorney or a criminal attorney experienced in the immigration consequences of criminal convictions," he would have known that a final conviction of the charge would make Dave inadmissible for reentry to the United States, permanently ineligible to return, and precluded from naturalization, and if he reentered illegally, he would face 20 years in federal prison.

One technique the attorney could have used to defend against adverse immigration consequences was to plead to a different but related offense. Another was to "plead up" to a nonaggravated felony even if the penalty was stiffer. In defendant's case, because he was a long-time resident of the United States, he would have been eligible for discretionary immigration relief called "Cancellation of Removal" even with this conviction.[8]

Mehr stated that he believed that if the attorney had offered to plead-up to offering to sell or transportation or offering to sell or transport marijuana, the prosecution would have accepted. Mehr based this opinion on the fact that the offer would have been to plead to a more serious offense with a greater sentencing exposure. On two cases which Mehr handled personally and three cases on which he consulted, such a disposition was obtained.

Dave submitted a declaration in support of the writ petition which stated that the INS told him he was to be deported solely as a result of this conviction. Because he lived here all his life and his entire family were here, deportation would cause extreme hardship to his family. Dave did not become aware of the grounds for his petition until he received the information in the appellate proceedings and after he was taken to El Centro. If Dave had known before he pled guilty that there were alternatives that would not create the devastating immigration consequences he is facing now, he would not have agreed to enter a plea to possession for sale. He would have asked his attorney to defend the case in every way possible to avoid or at least minimize the adverse immigration consequences to him. He would have used the immigration consequences to request that the charge be changed to simple possession or to an equivalent nonaggravated felony offense, and he would

---

[8] Another technique available in other cases, but not this one, is to obtain a disposition of 364 days instead of 365 days. That technique is effective as to crimes whose 'aggravated felony' status is based on the length of the sentence. (See, e.g., 8 U.S.C. § 1101(a)(43)(F), (G), (P), (R), (S).) In this case, a Health and Safety Code section 11359 offense constitutes an 'aggravated felony' regardless of the sentence imposed."

have offered to serve more time in custody if necessary to eliminate the possibility of mandatory deportation, or he would have taken the case to trial.

In the People's brief in response to Dave's petition, the People argue that Dave cannot establish prejudice because he would almost certainly be deported regardless of whether he pleaded guilty to violating Health and Safety Code section 11359 or section 11360. "While it is true that a violation of section 11360 does not necessarily constitute an aggravated felony trigger-ing mandatory deportation under federal immigration law, [Dave] would undoubtedly have been deported under 8 U.S.C. § 1182(a)(2)(C) [9] which requires the deportation of any alien believed to be involved in drug trafficking, regardless of whether the alien has been convicted of a criminal offense." The federal courts have held that 8 United States Code section 1182(a)(2)(C) does not require a conviction for inadmissibility or deportation; inadmissibility or deportation for controlled substances offenses may be established by the admission to the commission of such an offense. (See, e.g., *Alarcon-Serrano v. I.N.S.* (9th Cir. 2000) 220 F.3d 1116, 1119; *Pondoc Hernaez v. I.N.S.* (9th Cir. 2001) 244 F.3d 752, 756.) In this case, Dave pleaded guilty to possessing over 100 pounds of marijuana in July 2000, and had two arrests in 1994 involving controlled substance offenses. An immigra-tion officer could reasonably infer from Dave's admission and record that he is a drug trafficker, and order his deportation.

Although the People contend that the attorney's declaration does not support Dave's claim of ineffective assistance of counsel, that Dave's arrest history and the facts of his case support the conclusions that Dave is a drug trafficker and that the expert's declaration does not discuss important consid-erations in evaluating Dave's chances for relief from deportation, if Dave's position prevails with a referee, he has made a persuasive case: (1) that he was not properly advised of the immigration consequences of his plea; (2) that there was more than a remote possibility that the conviction would have one or more of the specified adverse immigration consequences, namely, that the INS has notified him that he will be deported when decision on his appeal is rendered; and (3) that he was prejudiced by the nonadvisement, that is, it is reasonably probable that he would not have pleaded guilty if properly advised. (See *People v. Totari* (2002) 28 Cal.4th 876, 884 [123 Cal.Rptr.2d 76, 50 P.3d 781].) Defense counsel admitted that the techniques for defending against the adverse consequences never crossed his mind. In 1977, "the Legislature expressly recognized the unfairness inherent in holding nonciti-zens to pleas they entered without knowing the consequent immigration

---

[9] "Any alien who the consular officer or the Attorney General knows or has reason to believe—[¶] (i) is or has been an illicit trafficker in any controlled substance . . . or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance" is inadmissible. (8 U.S.C. § 1182(a)(2)(C).)

risks" by adding Penal Code section 1016.5 requiring courts to advise of immigration consequences when taking a guilty or nolo contendere plea. (*In re Resendiz* (2001) 25 Cal.4th 230, 250 [105 Cal.Rptr.2d 431, 19 P.3d 1171]; § 1016.5 was added by Stats. 1977, ch. 1088, § 1, p. 3495.) "[T]remendous personal stakes" are involved in deportation and exclusion " 'involving as it may the equivalent of banishment or exile.' " (*In re Resendiz, supra,* 25 Cal.4th at p. 245.) " 'To banish [noncitizens] from home, family, and adopted country is punishment of the most drastic kind whether done at the time when they were convicted or later.' [Citation.]" (*Id.* at p. 251.) Dave falls into this class of aliens.

■ In our case, considering the relatively innocuous facts about the crime (namely, that Michael was the primary renter of the locker and had marijuana at home in his bedroom, and that Dave had no marijuana or contraband, and no firearms or violence were involved), the disparate effects of the sentences (Michael, a citizen, and Dave, a noncitizen, each received 16 months in state prison but Dave's prison term will be followed by deportation and exclusion and loss of "his job, his friends, his home, and maybe even his children, who must choose between their [parent] and their native country" (*Galvan v. Press* (1954) 347 U.S. 522, 533 [98 L.Ed. 911, 74 S.Ct. 737] (dis. opn. of Black, J.)), and the facts that Dave had no record of criminal convictions except this case, was a permanent resident of the United States, and had his entire family here including his parents, brothers, wife, and two young children, Dave may have been prejudiced by the attorney's failure to investigate, advise, and utilize defense alternatives to a plea of guilty to an "aggravated felony."

## DISPOSITION

As to the appeals, the judgments are affirmed. As to the petition for a writ of habeas corpus, we issue an order to show cause to the trial court for a reference hearing to take evidence and resolve factual issues relating to defendant's legal advice at the time of his plea. A report shall be made to this court at the conclusion of the reference hearing. (*In re Ross* (1995) 10 Cal.4th 184 [40 Cal.Rptr.2d 544, 892 P.2d 1287].)

Rushing, P. J., and Bamattre-Manoukian, J., concurred.

On February 17, 2004, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 14, 2004.